## SINCLAIR PRAIRIE OIL CO. et al. v. FLEMING.

No. 33208.   July 19, 1949.

Rehearing Denied Oct. 11, 1949.

Second Petition for Rehearing Denied and Dissenting Opinion Filed Nov. 28, 1950.

*225 P. 2d 348.*

Ralph W. Garrett, Edward H. Chandler, and I. L. Lockewitz, all of Tulsa, for plaintiffs in error.

W. F. Schulte and Robt. Wimbish, both of Ada, for defendant in error.

WELCH, J. The plaintiff, owner of a tract of land forming a part of the south bank of the South Canadian river, alleged that defendants built a fence along the north bank of the river in such a manner as to cause a diversion of the river waters from its natural course and to cause an eroding and washing away of a large area of the surface of plaintiff's lands, and claimed damages.

The defendants admitted that they caused the construction of a fence along the north bank of the river on lands owned or controlled by the defendant company, but denied that an erosion of plaintiff's lands was caused thereby, and denied the defendants were guilty of any wrongful, negligent or actionable act or conduct by reason of the construction of the fence.

A trial of the action resulted in a verdict and judgment in favor of the plaintiff and against the defendants, and defendants appeal.

It is first contended that plaintiff did not introduce sufficient evidence to establish a cause of action in his favor and against the defendants and that the trial court erred in overruling the defendants' demurrer to plaintiff's evidence and in overruling the defendants' motion for judgment at the close of all the evidence.

It is shown that the bed of the South Canadian river lying between its earthen banks formed by the lands of the plaintiff on the south, and the land of the defendants on the north, at the low water stage of the river, is a comparatively level and flat sandy surface several hundred yards wide, broken by shallow and comparatively narrow depression containing a flow of water. Such is the nature of the riverbed, generally, upstream and downstream from the lands of the parties, with an ambulatory low water channel existing in the broad river bed. For many years the low water flow of the river between the lands of the parties remained constant in the location in the river bed along the north bank.

In 1935, flood waters came down the river and several acres of the top soil of the defendants' land which had formed a part of the north bank of the

river was washed away, thus extending the river bed to the north and upon the defendants' land to the extent of the several acres that had washed away. Shortly after the flood waters had gone down and the river had receded to its low water channel, the defendants built a fence within the washedout area. Within a short time after the fence was erected there occurred another period of high water in the river which flowed into the fenced area. Within a short time the fenced area became filled with silt and sand to the approximate height of the fence and at the time or during the time the fill became extended into the original river bed and into the area where the low water flow had been prior to the first 1935 flood. The low water channel became shifted to a location farther to the south in the river bed than it had theretofore been. In subsequent years the fill or sandbar remained in place in the river bed and gradually increased in area and during the time the low water channel in the river bed gradually moved farther to the south. In 1941 there was a period of high water in the river of flood proportions and when the high water had receded the low water channel was located along the south bank of the river bed formed by the lands of the plaintiff. Thereafter a large area of the valuable top soil of plaintiff's land caved into the river.

There was testimony that during the period of high waters in 1941 some timber growing on the land of plaintiff was washed away. There is no claim for damages caused by waters overflowing the normal banks of the river bed and no testimony that the fence in the washedout area or the fill thereon was of a greater height than defendants' land as it had existed before the 1935 flood so as to have affected such flood waters.

The plaintiff sought recovery upon the premise that the acts of the defendants caused a diversion of the low water channel or the natural current or flow of the waters within the river bed from its natural location to a location along the banks of the river bed formed by plaintiff's land resulting in a caving and washing away of plaintiff's land upon the successive rising and falling of waters within the river bed.

Giving the evidence its strongest inference that the fence erected by the defendants caused the plaintiff's land to erode, or that the acts of the defendants caused loss to the plaintiff, the defendants cannot be held responsible for the injurious consequences of their acts unless the acts were so done as to constitute negligence, or violation of some right existing in plaintiff.

Undisputedly, the fence was erected on defendants' property and within the area washed out in 1935. It did not extend into the river bed as it existed prior to 1935, or into the area where the waters in the river bed had theretofore been accustomed to flow. It did not in itself obstruct the original channel and watercourse.

In the case of Gulf, C. & S. F. Ry. Co. v. Clark (C.C.A. 8, 1900) 101 Fed. 678, the following rule is stated, which is here applicable:

"A riparian owner upon a stream may construct necessary embankments, dikes, or other structures to maintain his bank of the stream in its original place and condition, or to restore it to that condition, and to bring the stream back to its natural course, when it has encroached upon his land; and, if he does no more, other riparian owners cannot recover damages for the injury his action causes them."

We note this expression in that case:

"While it is well settled that a riparian owner has no right to obstruct the natural channel of the river, so as to divert the current of the stream from its natural course, the true rule is that, when the river encroaches upon his land, he may take the necessary steps and use the necessary means to restore it to its original channel, to maintain his bank in its original condition, and to that extent, at least, to protect his property from incursions

of the water. . . . The restoration of a river to its original channel, and the maintenance of one of its banks in its original and natural condition, may often be to the prejudice of the riparian owners upon the other side of the stream, both in times of high and low water. But a riparian owner on the westerly bank of a stream is not required to sit in silence until his property is swept away by an encroaching river, because his preservation of it may increase the depth of the water in the channel, and cause an injury to the owner of the opposite bank which he would not have suffered if the water had been permitted to carry away the westerly bank. He has the right to protect his property against such encroachments, and when they have occurred, and the current of the stream has turned over upon his land, he has the right to restore it to its original channel. Any injury sustained by the owner of the opposite bank through such action is damnum absque injuria, and can only be avoided by his exercise of the same right to protect his own bank. . . ."

Applying the foregoing principle to the evidence in this case, the defendants were within their rights in building a fence in the washedout area of their land and within the space occupied by the land and bank in its original place and condition, and in so doing defendants took no rights from the plaintiff or violated any duty to the plaintiff.

The obstruction to the flow of waters within the washedout area of defendants' land in itself took no rights from the plaintiff. The principle is well stated in the syllabus in Barnes v. Marshall, 68 Cal. 569, 10 P. 115:

"A riparian owner may protect his land from a threatened change in the channel of the stream liable to occur by reason of the washing away of his bank, and in pursuance thereof may build a bulk-head as high as was his original bank before it was washed away. And this will not deprive the opposite owner of any right, nor give him legal ground for complaint."

It was shown that the river waters flowed into the fenced area and there was sand and silt deposited therein to the approximate height of the fence and of the land as it had existed before the washout, and that the fill was continuous and extended into the original channel. Insofar as the fence caused a restoration of defendants' land to no greater extent than their original bank before it was washed away, plaintiff could have no legal grounds to complain even if he suffered injury as a result of such restoration. Any conclusion that defendants were guilty of negligence or violated any duty to the plaintiff in erecting the fence must rest on the premise that the fence has a more injurious effect on the plaintiff's land than would have resulted if the original bank had been in place. With the fence not extending into the river bed as it existed prior to the 1935 flood and not shown to be of a greater height than the land and bank as existing prior to the washout, with the coming of high waters sufficient to flow into the fenced area, the fence could not constitute a greater obstruction or interference with the flow of such water than if the ground and bank had been in its original place and condition. At its greatest effect the fence could only slow down or check the flow of the water and if the result of such slowing down or check of the flow was to cause a fill or sandbar to form in the original channel, clearly a complete repelling of the current or stoppage of the water at the original bank line would have resulted in a fill or sandbar in the original channel of equal or greater proportions. If the defendants had fully restored their washed land and bank to its original place and condition, and with the river restored to its original channel, a bar had formed against such bank and in the channel causing injury to the opposite bank, such injuries would not be attributable to any fault of the defendants and plaintiff would have no redress; such injuries sus-

tained would be "damnum absque injuria." Likewise, a fence within the washed area of no greater effect on the river than a full restoration of the washed land does not give rise to a cause of action for injuries to the opposite bank.

Any conclusion to be drawn from the evidence that the fence had more injurious effect on plaintiff's land than would have resulted if the original bank had been replaced would be the result of conjecture or speculation if not contrary to sound reason. Negligence may not be inferred, but must be proven.

The plaintiff, in his brief, in argument that the evidence was sufficient to show a cause of action against the defendants, cites the case of Atchison, T. & S. F. R. Co. v. Hadley, 168 Okla. 588, 35 P. 2d 463, wherein it was said:

"It is fundamental that no one may change, divert, obstruct, or otherwise interfere with the natural flow of a water course without being chargeable in damages to persons or properties injured thereby. . . .

"It would reasonably appear that any change made in the natural current, course, or flow of such water course by which the waters thereof are caused to erode the lands of another is within this well established rule."

Other cases from this jurisdiction are cited wherein these general rules were applied. In the Hadley case and the other cited cases there existed a state of facts with some similarity, but in certain particulars not analogous to the situation here involved.

In the Hadley case the defendant railway company erected an embankment not in the stream bed where the river in its ordinary stages of water flowed, but upon the bank and across adjacent lowland and higher than such bank and lowland in its natural state so as to divert flood waters flowing above the normal banks. It is pointed out in the opinion that when in times of high water a stream extending beyond its banks, is accustomed to flow down over adjacent lowlands in a broader but still definable stream, it has the character of a water course, and the law relating to water courses is applicable.

In the other cases cited there existed a similar state of facts in that in each instance an obstruction was placed above the ground in its natural state, either in the stream bed lying between the normal banks or on the banks or adjacent lowlands subject to overflow and constituting a part of the stream bed or natural water course in the high water stages of the stream.

The general rule in reference to the obstruction and diversion of a natural water course has no application to the facts in this case.

Herein the defendants placed a structure in a washedout area having an effect upon a flow of waters therein of causing a fill and raising the level of their ground so as to cast the water into its original course, and injuries resulting from the water flowing in the original channel are not attributable to the defendants.

The judgment is reversed and the case remanded, with directions that the same be dismissed.

ARNOLD, V.C.J., and CORN, GIBSON, HALLEY, and JOHNSON, JJ., concur. DAVISON, C. J., and LUTTRELL and O'NEAL, JJ., dissent.

DAVISON, C. J. (dissenting). Although I think the principles of law, stated in the opinion of the majority of the court, are sound, I cannot agree with the result therein reached. The record is voluminous. Many witnesses testified and numerous exhibits were put in evidence but the facts so established are not complicated. It is particularly important that the physical conditions be identified as to their time of existence in order that the effects of defendants' acts may be determined. This, I think, the majority opinion fails to do and consequently the conclusions therein reached are not warranted.

In the opinion it is said that the bed of the river "lying between its earthen banks formed by the lands of the plaintiff on the south, and the lands of the defendants on the north, at the low water stage of the river, is a comparatively level and flat sandy surface several hundred yards wide, broken by shallow and comparatively narrow depression containing a flow of water. Such is the nature of the river bed, generally, upstream and downstream from the lands of the parties, with an ambulatory low water channel existing in the broad river bed. For many years the low water flow of the river between the lands of the parties remained constant in the location in the river bed along the north bank."

This statement leaves the impression that this condition existed after defendants built the fences, as well as before. Such was not the case. For many years, the low water channel of the river had been against the north bank or defendants' land. After the first flood in 1935 which washed away a part of defendants' land and after the water had receded, they built a fence some 1,800 feet in length parallel with, and in the then river bed, with three 200 foot wings extending at an angle to the north. The upstream or west end of the fence was near a point of land jutting out from the north bank of the river. This fence and the wings thereto were formed of posts made by driving lengths of pipe into the ground every 7 or 8 feet until they stood some 5 or 6 feet above the river bed. Stretched between these posts, was net hog wire fencing and then iron rods were woven into the fencing and welded to the posts.

This structure tended to slow the current of the river, when flowing through it, to the extent that the sand and debris in the water was deposited below the fence. This caused a sandbar to start forming which built upstream until the fence was covered over. The testimony shows that this bank or bar built up until it was a half mile or so long east and west, and covered with willow and cottonwood trees and other veg-

etation. By 1941, this bank or bar had built up wide enough to extend several hundred feet out into the river bed. It covered the fence on its north side and sloped south, out into the river bed, causing the low water channel of the river to move South toward plaintiff's land. The low water channel was thus moved away from defendants' land toward plaintiff's land across its former location and several hundred feet beyond as a direct result of defendants' acts.

There was a severe flood in 1941 which caused plaintiff's greatest loss, a washing away of many acres of farm land and pecan orchard. After the water receded, the channel was against the south bank or plaintiff's remaining land. By 1943, this sandbar extended from the north bank about two-thirds of the way across the river.

With these facts in mind, I cannot agree with the statement in the majority opinion to the effect that, when the defendants constructed the fences and changed the channel of the river, they "took no rights from the plaintiff or violated any duty to the plaintiff;" or with the conclusion that,

"Herein the defendants placed a structure in a washed-out area having an effect upon a flow of waters therein of causing a fill and raising the level of their ground so as to cast the water into its original course, and injuries resulting from the water flowing in the original channel are not attributable to the defendants."

The testimony shows that for 15 years or more, the low water channel of the river had been against the north bank adjacent to the lands of defendants and the river had caused no damage to plaintiff. Immediately after the fence was built, the river came up and went back down within 24 hours. In that short time, the space between the fence and the north bank was filled up. The low water channel of the river began moving south, pushed over by the sandbar formed around and over the fence built by defendants. The sandbar con-

tinued to build out into the river bed causing the channel to move farther south until in 1941 it had been moved some 500 or 600 feet. When the floods of 1941 came, the full force and effect of this channel change resulting from the structure placed in the river bed by defendants, became apparent. The flood waters cut into the river bank on the south and carried away 70 acres of plaintiff's land. This was the first time any of plaintiff's land had been washed away.

The rule stated in the syllabus in the majority opinion, as adopted from the opinion in the case of Gulf, C. & S. F. Ry. Co. v. Clark, 101 Fed. 678, 41 C. C. A. 597, is a sound rule of law but never extends in its application beyond the limitation contained in the last phrase: "and, if he does no more, other riparian owners cannot recover damages for the injury his action causes them." Whether or not defendants' acts exceeded this limit of propriety and freedom from responsibility for resultant damages was a question of fact for determination by the jury. That such is the rule, was recognized in the cited case. There, the appellate court did not attempt to relieve the defendant of liability, but left it to the jury to determine by granting a new trial.

In the instant case this question was presented to the jury. Many witnesses testified as to the conditions both before and after the construction of the fences by defendants. Some 100 exhibits were introduced consisting of maps, plats, photographs, geological and topographical data, and agricultural reports. With this first-hand information, the jury returned its verdict in favor of plaintiff and fixed the amount which it thought he was entitled to recover.

For these reasons, I think the judgment of the trial court, founded upon the verdict of the jury, should be affirmed and I therefore respectfully dissent.

I am authorized to state that Mr. Justice LUTTRELL and Mr. Justice O'-

NEAL concur in the above dissenting views.

